**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NOT FOR PUBLICATION

In re:

       GRUBB & ELLIS CO., *et al.,*

                   Debtors.

Chapter 11

Case No. 12-10685 (MG)

(Jointly Administered)

## MEMORANDUM OPINION APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

*A P P E A R A N C E S :*

**TOGUT, SEGAL & SEGAL LLP**
*Counsel to the Debtors and Debtors in Possession*
One Penn Plaza
Suite 3335
New York, New York 10119
By:    Frank A. Oswald, Esq.
        Jonathan P. Ibsen, Esq.
        Lara R. Sheikh, Esq.

**ALSTON & BIRD LLP**
*Proposed Counsel to the Official Committee of Unsecured Creditors*
90 Park Avenue
New York, New York 10016
By:    Martin G. Bunin, Esq.
        Craig E. Freeman, Esq.
        John W. Spears, Esq.

**GOODWIN PROCTER LLP**
*Counsel to BGC Partners, Inc.*
620 Eighth Avenue
New York, NY 10018
By:    Emanuel C. Grillo, Esq.
        Brian W. Harvey, Esq.

REED SMITH LLP
*Counsel for the CenturyLink Entities*
599 Lexington Avenue, 27th Floor
New York, New York 10022
By:    Nicole O'Sullivan, Esq.

ANDREWS KURTH LLP
*Counsel to Zazove Associates LLC*
450 Lexington Avenue, 15th Floor
New York, New York 10017
By:    Paul N. Silverstein, Esq.
       Jeremy B. Reckmeyer, Esq.

OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP
*Counsel for Ad Hoc Committee of Brokers*
Park Avenue Tower
65 East 55th Street
New York, New York 10022
By:    Michael S. Fox, Esq.
       Eric L. Goldberg, Esq.
       Jordanna L. Nadritch, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Attorneys for Vincent Carrega, Neil Helman, Jon Epstein, Charles Kingsley, Yoav Oelsner,*
*Jason Meister, Michael Gottlieb, Howard Grufferman and Martin Cottingham*
1633 Broadway
New York, New York
By:    Andrew K. Glenn, Esq.
       Jeffrey R. Gleit, Esq.

DECHERT LLP
*Counsel to the Forward Funds*
1095 Avenue of the Americas
New York, New York 10036
By:    Brian E. Greer, Esq.
       James O. Moore, Esq.

FRANK LOPRIORE
*Pro Se*
10 Henry Avenue
Park Ridge, New Jersey 07656

JOHN DONNELLY
*Pro Se*
280 West Oak Street
Ramsey, New Jersey 07446

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the Debtors' motion for an Order authorizing and approving

the sale of substantially all of the Debtors' assets (the "Sale Motion").  (ECF Doc. # 12.)  A

number of the Debtors' brokers and contract counterparties object to the sale.  The vast majority

of these objections were either resolved entirely or deferred to a later time.  The Court now

overrules the remaining objections and approves the Sale Motion.  Also before the Court is a

proposed settlement stipulation between the Debtors, the Creditors Committee and the proposed

purchaser, BGC Partners, Inc.  ("Settlement Stipulation).  (ECF Doc. # 778.)  No separate

objections were raised to the Settlement Stipulation and it is likewise approved.

## BACKGROUND

In the early months of 2012, the Debtors[1] were in imminent default of their credit facility

with GNE Loan Funding, LLC and C-III Investments LLC as lenders in the amount of $28

million (the "Senior Secured Debt").  Debtors were also experiencing strained liquidity, and

were projected to have insufficient cash for their operating needs through the first quarter of

---

[1]      The Debtors consist of the following entities: Grubb & Ellis Company; Grubb & Ellis New York, Inc.;
Grubb & Ellis Affiliates, Inc.; Grubb & Ellis of Arizona, Inc.; Grubb & Ellis of Michigan, Inc.; Grubb & Ellis of
Nevada, Inc.; Las Vegas Commercial Brokerage, LLC; Grubb & Ellis Consulting Services Company; Grubb & Ellis
Capital Corporation; Grubb & Ellis Equity Advisors, LLC; Grubb & Ellis Landauer Valuation Advisory Services,
LLC; GBE Alesco Corp.; Grubb & Ellis Securities, Inc.; Grubb & Ellis Management Services, Inc.; Grubb & Ellis
Management Services of Michigan, Inc.; Grubb & Ellis Apartment REIT Advisor, LLC; and Grubb & Ellis
Healthcare REIT II Advisor, LLC.

2012. (Rispoli 1007 Decl. ¶ 15.) Since the beginning of 2012, in light of the Debtors' ongoing

financial difficulties, a large number of the Debtors' brokerage agents, representing nearly 30%

of the Debtors' overall 2011 brokerage revenue, terminated their relationships with the Debtors.

In response to these troubles, the Debtors engaged restructuring and investment banking

professionals, including Alvarez & Marsal North America, LLC and its wholly owned

subsidiary, Alvarez & Marsal Securities, LLC (collectively, "A&M"), to assist in negotiations

with creditors, shareholders, and other parties in interest. When the Debtors prepetition secured

lenders refused to provide debtor-in-possession financing to finance Debtors' businesses until a

section 363 sale could be arranged, A&M facilitated a purchase of the Debtors' Senior Secured

Debt by BGC Partners, Inc. ("BGC") after a robust marketing process. A&M also helped

negotiate a stalking horse bid by BGC, subject to higher and better offers. After no other bidders

emerged, the Debtors filed the Sale Motion seeking approval of the section 363 sale to BGC.

## I.    Procedural History

On February 20, 2012 (the "Petition Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code. (ECF Doc. # 1.) In support of their petitions

and the first-day motions, the Debtors filed the declaration of Michael J. Rispoli, dated February

20, 2012 (the "Rispoli 1007 Declaration"). (ECF Doc. # 2.) On March 7, 2012, the Court

approved bidding procedures and protections in connection with the sale of substantially all of

the Debtors' assets (the "Bidding Procedures").

On March 7 and 8, 2012, the Debtors served notice of the sale on all known creditors and

more than 8,000 cure notices to all known contract counterparties advising them that their

contracts may be assumed and assigned to the successful purchaser of the Debtors' assets. The

Bidding Procedures established the following expedited sale schedule:

4

- Sale Hearing: March 22, 2012 at 2 p.m.

- Sale Objection Deadline: March 16, 2012 at 4 p.m.

- Response Deadline: March 21, 2012 at 4 p.m.

- Preliminary Bid Deadline: March 19, 2012 at 4 p.m.

- Qualified Bid Deadline: March 20, 2012 at 4 p.m.

- Auction: March 21, 2012 at 12 p.m. (only if a qualified competing bid is received)

Other than BGC's stalking horse bid, the Debtors did not receive any other qualified bids before the Qualified Bid Deadline. The Debtors filed a *Notice of Cancellation of Auction Scheduled For March 21, 2012 at 12 Noon* (ECF Doc. # 720), and named BGC as the successful purchaser of the Debtors' assets.

## II.    Objections to Sale Motion

Over 700 objections (the "Cure Objections") were filed in response to the cure notices for unexpired leases and executory contracts that BGC Partners, Inc. ("BGC"), as the successful purchaser, may seek to assume. As stated on the record at the Sale Hearing, the objections to the cure amounts were adjourned until BGC identifies the contracts it elects to assume; therefore, those objections need not be addressed in conjunction with the Sale Motion.

In addition to the Cure Objections, the following parties filed objections to the Sale Motion that were addressed at the Sale Hearing (the "Objections"):

1)    Aetna Life Insurance Company ("Aetna") (ECF Doc. # 159);

2)    Inland Oak Brook Int'l Office Center LLC, Inland American Loves Park Clifford LLC, MB BP Portfolio LLC, Inland American Retail Mgmt., LLC, Inland American Office Mgmt., LLC, and Inland American and Industrial Mgmt., LLC (collectively, "Inland") (ECF Doc. # 201);

3)    Griffin-American Healthcare REIT II, Inc. and Griffin-American Healthcare REIT II Holdings, LP ("REIT II") (ECF Doc. # 211);

4)    Qwest Corporation d/b/a CenturyLink ("CenturyLink") (ECF Doc. # 216);

5)    Thirteen Agents Represented by Ulmer & Berne LLP ("O'Brien et al.") (ECF Doc. # 219);

6)    Jeffrey Sweeney ("Sweeney") (ECF Doc. # 219);

7)    CoStar Realty Information, Inc. ("CoStar") (ECF Doc. # 220);  and

8)    Towers Crescent, LLC ("Towers Crescent") (ECF Doc. # 221)

9)    Steven J. Monroe ("Monroe") (ECF Doc. # 228);

10)   Daniel M. Cressman ("Cressman") (ECF Doc. # 230);

11)   Ted Parris ("Parris") (ECF Doc. # 230);

12)   Los Angeles County Tax Collector ("Los Angeles County") (ECF Doc. # 232);

13)   Ace American Insurance Co. ("Ace") (ECF Doc. # 237);

14)   Nine Agents Represented by Kasowitz, Benson, Torres & Friedman LLP ("Carrega") (ECF Doc. # 238);

15)   Forty-Nine Agents Represented by Olshan Grundman Frome Rosenzweig & Wolofsky LLP (the "Ad Hoc Committee") (ECF Doc. # 239);

16)   Scott Tew ("Tew") (ECF Doc. # 244);

17)   Tew Realty Advisors, Inc. ("Tew Realty") (ECF Doc. # 246);

18)   Six Deferred Compensation Plan Claimants ("DCP Claimants") (ECF Doc. # 247);

19)   Parker-Hamilton Property Group, LLC ("Parker-Hamilton") (ECF Doc. # 248);

20)   Zazove Associates, LLC ("Zazove") (ECF Doc. # 261);

21)   John Donnelly ("Donnelly") (ECF Doc. # 539);

22)   Frank Lopriore ("Lopriore") (ECF Doc. # 541);

The Debtors filed the *Debtors' Omnibus Response to Objections to Debtors' Motion for Entry of an Order, Inter Alia, Authorizing and Approving (I) the Sale of Substantially all of the Debtors' Assets and (II) the Assumptions and Assignment of Executory Contracts and Unexpired Leases* (the "Debtors' Response").  (ECF Doc. # 763.)  The Debtors also filed the declaration of

Marc Liebman (the "Supplemental Liebman Declaration") (ECF Doc. # 764) and the declaration

of Michael J. Rispoli, dated March 21, 2012 (the "Rispoli Declaration") (ECF Doc. # 765),

addressing the Objections.  BGC, as the successful purchaser of the Debtors' assets, filed the

declaration of Charles S. Edelman (the "Edelman Declaration") in support of the sale.  (ECF

Doc. # 769.)  The Official Committee of Unsecured Creditors (the "Committee") also filed a

statement (the "Committee Statement") (ECF Doc. # 779) and the declaration of Samuel E. Star

(the "Star Declaration") of FTI, the Committee's financial advisor (ECF Doc. # 780), in support

of the Sale Motion.

At the time the Court approved the bidding procedures, the Court announced that the sale

hearing would be an evidentiary hearing.  On March 22, 2012, the Court entered an order

establishing procedures for the contested Sale Hearing.[2]  At the Sale Hearing, the Debtors

introduced the following declarations into evidence in support of the Sale Motion: (1) the Rispoli

1007 Declaration; (2) the declaration of Michael J. Rispoli, dated March 1, 2012 (the "Rispoli

Broker-Loan Declaration") (ECF Doc. # 95); (3) the declaration of Mark Liebman, dated March

4, 2012 (the "Original Liebman Declaration") (ECF Doc. # 80); (4) the declaration of Michael J.

Rispoli, dated March 13, 2012 (the "Rispoli Co-Broker Declaration") (ECF Doc. # 123); (5) the

Supplemental Liebman Declaration; (6) the Rispoli Declaration; (7) the Star Declaration; and (8)

the Edelman Declaration.

Additionally, at the Sale Hearing, the Debtors informed the Court that all but seven of the

Objections had been resolved or deferred to a later time.  The remaining objections to be heard

during the course of the Sale Hearing included: (1) CenturyLink; (2) Zazove; (3) Forward

---

[2]    At the March 14, 2012 hearing, the Court also stated that it expected all parties to present evidence in
support of their motions or objections at the Sale Hearing.

Funds[3]; (4) Lopriore; (5) Donnelly; (6) the Ad Hoc Committee; and (7) Carrega (collectively, the

"Remaining Objections").  During the Sale Hearing, the Debtors and CenturyLink resolved

CenturyLink's objection.

The Court has considered the merits of each of the Remaining Objections, and, for the

reasons discussed below, the Court overrules the Remaining Objections and grants the Sale

Motion.

## DISCUSSION

### A.    The Sale Is a Valid Exercise of the Debtors' Business Judgment

Although the Committee negotiated a global settlement with the Debtors and BGC and

filed a statement in support of the Sale Motion, Zazove, a member of the Committee, argues that

the Debtors have failed to present evidence of a *bona fide* business reason justifying a sale of the

Debtors' potential causes of action against the Debtors' officers and directors and the

broker/banker that ran the unsuccessful prepetition sale process of the Debtors' businesses.

Zazove argues that those actions should be prosecuted by the Debtors, and any funds recovered

should benefit the Debtors' estates and unsecured creditors.

The Bankruptcy Code provides that debtors "may use, sell, or lease, other than in the

ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In approving a

transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised

sound business judgment.  *See In re Chateaugay Corp.*, 973 F.2d 141, 144-45 (2d Cir. 1992)

(holding that section 363(b) was applicable because sound business judgment supported the sale

of the assets); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063,

1072 (2d Cir. 1983) (holding that the application of section 363(b) must be supported by "some

---

[3]    The Forward Funds joined in Zazove's objection.  Although the Forward Funds filed their joinder after the
objection deadline and did not present any arguments at the Sale Hearing, the Court has considered the joinder of the
Forward Funds in its analysis of the Zazove objection.

articulated business justification, other than appeasement of major creditors" and that "a judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application"); *In re Global Crossing Ltd*., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (citing *In re Lionel Corp*., 722 F.2d at 1071) (emphasizing the business judgment standard).[4]

Although the determination of what constitutes a sufficient business reason depends on the facts and circumstances of each case, a debtor often satisfies the business judgment standard if "the directors of the corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc*., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Courts should not generally interfere with business decisions absent a showing of "bad faith, self-interest, or gross-negligence." *Id*. at 646.

In the context of auctions, courts defer to a debtor's business judgment when selecting the highest and best bid. *See In re Gulf States Steel, Inc. of Ala*., 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002). Indeed, "the trustee or DIP is entitled to great judicial deference in deciding which bid to accept as the best and highest bid on the sale of the Debtor's assets; and although the trustee's or DIP's discretion is not without limit, the Court should not step in and assume a role and responsibility properly placed by the Code in another's hands." *In re Castre, Inc*., 312 B.R. 426, 430-31 (Bankr. D. Colo. 2004).

Here, the Debtors have established that the sale of substantially all of their assets is the result of the exercise of their valid business judgment. The evidence presented to the Court

---

[4]    A motion to sell a debtor's assets is, at its core, "a summary proceeding, intended to efficiently review the trustee's or debtor's decision." *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (finding that a motion to assume an executory contract, which requires a review of a debtor's business judgment is a summary proceeding).

clearly shows that Debtors' commenced a strategic process to restructure their operations in February 2011. (Rispoli 1007 Decl. ¶ 12.) The Debtors solicited over fifty strategic and financial bidders, but were unable to affect a restructuring outside of bankruptcy. (*Id.* ¶¶ 14, 94-109, 120-127). The Debtors filed their petitions with the sole purpose of consummating a sale of substantially all of their assets. The sale process was fair, robust, and pursued in good faith. Notably, the Committee played an active role in negotiating a higher cash component for the purchase price.

Subsequent to the approval of the Bidding Procedures, ten parties became qualified bidders. (Supplemental Liebman Decl. ¶ 6.) Those parties accessed the electronic data room established by the Debtors for due diligence purposes. (*Id.*) A&M followed up on inquiries from those parties through frequent telephonic and e-mail communications. (*Id.* at 8.) However, none of those qualified bidders submitted a bid, and the Debtors cancelled the auction and named BGC, the stalking horse bidder, as the successful purchaser of the Debtors assets. As there are no other bidders, the sale to BGC is the Debtors' only alternative to liquidation. (Rispoli Decl. ¶ 7.) Based on these facts, the Debtors have illustrated a sound justification for the sale.

Zazove, however, argues that the Debtors have failed to provide any basis for the inclusion of potential causes against former directors and officers to BGC. Therefore, according to Zazove, the Court should find that the sale of those actions is not a valid exercise of the Debtors' business judgment. The Court is unpersuaded by Zazove's arguments. The Debtors, BGC, and the Committee proceeded with hard-fought negotiations throughout the pendency of these cases. The Court is satisfied that the ultimate deal that was proposed, including the sale of the Debtors' causes of action against former directors and officers and certain releases, is BGC's

highest and best offer.  The inclusion of the Debtors' causes of action against former officers and directors was an integral part of that offer.[5]

Moreover, the deal is structured in such a way that the Debtors' estates, BGC, the Committee, and Zazove could potentially share in any proceeds from the causes of action at issue.  The $16 million cash portion of the purchase price includes a guaranteed $10 million advance on proceeds from recoveries on those causes of action.  Pursuant to the terms of the sale, BGC will be entitled to the first $20 million in proceeds realized from litigating the causes of action, and the Debtors' estates and BGC would split any proceeds realized above $20 million.[6]  Thus, if the causes of action prove as valuable as Zazove believes, the Debtors' estates and ultimately Zazove would share in the proceeds of those causes of action.  For these reasons, the Court overrules Zazove's objection and finds that the sale of the Debtors' assets to BGC is a valid exercise of the Debtors' business judgment.

### B.    The Brokers Have Failed To Prove the Existence of a Constructive Trust on Commissions

Carrega objects to the sale, arguing that the brokerage commissions the Carrega brokers earned are held in a constructive trust and cannot be sold or assigned through the sale of the

---

[5]      Zazove argued that the Court could deny only the sale of the Debtors' causes of actions against former directors and officers.  However, the Court is faced with the question whether to approve or deny the sale in its entirety.

[6]      According to Section 6.11 of the Amended Asset Purchase Agreement, which was attached as Exhibit A to the Committee Statement,

> Any net cash proceeds (after deducting costs of collection including attorneys' fees and other expenses) from such Causes of Action received after the Closing by Buyer shall be allocated as follows (i) first, to Buyer until Buyer receives from the cash proceeds of such Causes of Action, an amount equal to (A) two times the amount by which the Closing Cash Purchase Price exceeds $6,000,000 plus (B) the amount of any Assumed PTO Liabilities paid by Buyer, and (ii) second, fifty percent (50%) to Buyer and fifty percent (50%) to the Sellers, except that proceeds of Causes of Action against JMP Securities, Inc., any of its Affiliates, or any other current or former advisors to the Sellers allocated pursuant to this clause (ii) shall be allocated seventy five percent (75%) to Buyer and twenty five percent (25%) to the Sellers.

Debtors' assets. The Asset Purchase Agreement includes among the sale assets Debtors' rights to receive brokerage commissions. Section 541(a)(1) of the Bankruptcy Code provides that the "estate" created by bankruptcy proceedings includes "all legal or equitable interests of the debtor in property [that the debtor holds] as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 541(d) provides that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d). "[W]hile the outer boundaries of the bankruptcy estate may be uncertain, 'Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition.'" *In re Howard's Appliance Corp.*, 874 F.2d 88, 93 (2d Cir. 1989) (quoting *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983)).

In the context of a 363 sale, a bankruptcy court may not approve the sale of property as "property of the estate" without first determining whether the debtor in fact owned the property. *See Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (9th Cir. B.A.P. 2001) (holding that "[t]he threshold question, is [the property] still property of the estate, must . . . be decided" before it can be sold free and clear under section 363(f)); *In re Coburn*, 250 B.R. 401, 403 (Bankr. M.D. Fla. 1999) (finding it necessary to determine whether an asset is property of the estate in order to decide whether the trustee is entitled to sell the asset pursuant to section 363(f)). Moreover, pursuant to section 363(p), "the entity asserting an interest in property has the burden of proof on the issue of validity, priority, or extent of such interest." 11 U.S.C. § 363(p); *see In re MF Global Holdings Ltd.*, No. 11-15059, 2011 WL 6210374, at *4-5 (Bankr. S.D.N.Y. Dec. 14, 2011).

12

The burden of establishing the existence of a trust falls upon Carrega.  While filing a timely objection, Carrega has not provided any evidence supporting imposition of a constructive trust at this time.

New York law generally requires four elements for a constructive trust: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject res made in reliance on that promise; and (4) unjust enrichment." *Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 212 (2d Cir. 2004) (citing *United States v. Coluccio*, 51 F.3d 337, 340 (2d Cir. 1995)); *see also Bankers Sec. Life Ins. Soc'y v. Shakerdge*, 49 N.Y.2d 939, 940 (N.Y. 1980); *Simonds v. Simonds*, 45 N.Y.2d 233, 241-42 (N.Y. 1978).  The Second Circuit has previously found that the fourth element is the most important because "the purpose of the constructive trust is prevention of unjust enrichment." *In re First Cent. Fin. Corp.*, 377 F.3d at 212 (quoting *Simonds*, 45 N.Y.2d at 242).  Moreover, courts in the Second Circuit have held that unjust enrichment only exists where no prior agreement governed the rights of the parties.  *See In re First Central Fin. Corp.*, 377 F.3d at 213.

In support of the objection, Carrega principally relies on *Committee of Unsecured Creditors of Rama Group of Companies v. Gottesman Company (In re Rama Group of Companies)*, No. 01-CV-0424E, 2002 WL 1012974 (W.D.N.Y. May 6, 2002).  The court in *Rama* held that a constructive trust existed with respect to a commission earned by a broker upon the closing of a sale.  In *Rama*, the broker agreed, pre-bankruptcy, to find a buyer for the debtor's assets.  After the sale of the assets was completed, the debtor filed its bankruptcy petition and failed to pay the broker his commission.  On appeal from the bankruptcy court, the district court found that the broker did not have an equitable lien, but rather that a constructive trust existed as to the commission earned.  The court cited to the New York Court of Appeals decision in *Sharp*

*v. Kosmalski*, 40 N.Y.2d 119, 121 (N.Y. 1976), where the court delineated four factors that serve as guideposts for the application of a constructive trust.[7]  Further, the court in *Rama* explained that "constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him to a trustee."  *Rama*, 2002 WL 1012974, at \*7 (quoting *Simonds v. Simonds*, 45 N.Y.2d at 241).

The brokers' reliance on Rama is misguided.  In Rama, the parties agreed that the broker would obtain a buyer to purchase the debtor's assets.  *Id.* at \*9.  Because the broker produced a buyer, resulting in the sale of the debtor's assets, the court found it inequitable for the broker not to receive his earned commission.  *Id.*  Here, the Debtors are the actual "brokers" and their employees/professionals are merely "agents."  (Rispoli Decl. ¶ 20.)  Moreover, the Debtors' agreements with third-party clients provide that commissions are owed to the Debtors upon the closing of a sale or lease (not to the agents of the brokers), and the agents' right to payments stems solely from separate agreements with the Debtors and their agents (not the property owners).  (*Id.* ¶¶ 21-23.)  Thus, under the facts of Rama, the Debtors, as the broker, may be entitled to recover unpaid commissions under a constructive trust theory, but the Debtors' individual agents, who are either employees or independent contractors working exclusively for the Debtors, would not be entitled to assert a constructive trust.

Furthermore, the uncontroverted evidence establishes that the funds received by Debtors from the closing of transactions are deposited in the Debtors' general bank account.  Funds deposited in the Debtors' general bank account are commingled, with funds received from other sources and the funds in the account are used for the general operations of the Debtors.  (*Id.*

---

[7]        These factors are: (1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment.  *See Sharp v. Kosmalski,* 40 N.Y. 2d at 121.

¶ 25.)  The general account is not used exclusively for commissions.  (*Id.* ¶ 25.)  The evidence

established that the Debtors are the sole owner of commissions received; they are not required to

segregate commissions; and the use of commissions received is not restricted.  (*Id.* ¶ 28.)  Thus,

in most cases,[8] the Debtors have contractually provided that commissions from sales are owed to

the Debtors, which the Debtors then have an obligation to pay their agents.  Those commissions

are property of the Debtors' estates.  The Debtors' contracts with their agents create the rights to

payment of commissions to the agents, which may be general unsecured claims, priority claims,

or administrative claims, depending on when the commissions are earned by the agents.

The main goals of the bankruptcy laws are "to secure a prompt and effectual

administration and settlement of the estate of all bankrupts within a limited period," *Katchen v.*

*Landy,* 382 U.S. 323, 328-29 (1966) (internal quotation marks and citation omitted), "to place

the property of the bankrupt, wherever found, under the control of the court, for equal

distribution among the creditors," *MacArthur Co. v. Johns-Manville Corp.,* 837 F.2d 89, 91 (2d

Cir. 1988) (internal quotation marks and citation omitted), and "to protect the creditors from one

another," *Young v. Higbee Co.,* 324 U.S. 204, 210 (1945).  But "the constructive trust doctrine

can wreak . . . havoc with the priority system ordained by the Bankruptcy Code" by creating a

separate allocation mechanism outside the scope of the bankruptcy system.  *In re Haber Oil Co.,*

12 F.3d 426, 436 (5th Cir. 1994).  The Second Circuit in *In re First Central Financial Corp.*

further explained that "a constructive trust is an equitable remedy intended to be 'fraud-

rectifying' rather than 'intent-enforcing.'"  *Id.* at 216 (citing *Bankers Sec. Life Ins. Soc'y*, 49

N.Y.2d at 940); *see also George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1538 (2d Cir.

1992).  Here, Carrega's rights are specifically provided for under the terms of the employment

---

[8]      Five of the eight individual agreements that were attached to the Rispoli Declaration as Exhibits C–J
include language that confirms that the "Company owns all commissions and fees paid in exchange for the real
estate services provided by its agents . . . ."  A number of these agreements also appear to have expired.

agreements.  The Court cannot and will not modify those terms based on the theory of constructive trust.

At this time, the Court finds that Carrega has failed to provide any evidence establishing the existence of a constructive trust.  For these reasons, the Court overrules Carrega's objection.

### C.    The Brokers Have Failed To Prove the Existence of a Lien on Commissions

#### 1.  The Donnelly and Lopriore Objections Lack Merit

Donnelly and Lopriore argue that their employment agreements and commission agreements, attached as exhibits to their objections, entitle them to liens on the commissions earned on certain transactions.  The Court has reviewed these employment agreements; they contain language confirming that the "Company owns all commissions and fees paid in exchange for the real estate services provided by its agents . . . ."  Donnelly and Lopriore have failed to provide any other evidence illustrating an alternative intent on the part of the Debtors or any law that would provide them with a lien on commissions.  For these reasons, the Court overrules their objections.

#### 2.  The Ad Hoc Committee of Brokers has Failed to Prove the Existence of a Lien

The Ad Hoc Committee filed a *Statement Seeking Clarification and Reservation of Rights* (the "AHC Statement").  (ECF Doc. # 239.)  Through the AHC Statement, the Ad Hoc Committee specifically stated that they do not oppose the Sale Motion.  Rather, the Ad Hoc Committee requests clarification regarding (i) what BGC believes it is buying, (ii) that BGC is not purchasing commissions owed to the brokers not yet received by the Debtors, and (iii) that commissions paid by third parties after the closing of the sale will be paid in the ordinary course to the brokers as they become due.

16

At the Sale Hearing, however, the Ad Hoc Committee raised objections that were not addressed in the AHC Statement. The Ad Hoc Committee argued that their clients have a lien on all unpaid commissions under Article 2 of the New York Lien Law ("New York Lien Law"). The Ad Hoc Committee cited no case law in support of its oral and tardy objection. Under the applicable provisions of New York Lien Law and New York Real Property Law ("New York Property Law"), the Ad Hoc Committee failed to establish that the brokers have liens on unpaid commissions. *See* N.Y. LIEN LAW §§ 3-39-c (McKinney 2011); N.Y. REAL PROP. LAW § 294-b (McKinney 2011).

First, New York Lien Law plainly states that those who "perform[] labor . . . for the improvement of real property . . . shall have a lien . . . *upon the real property* improved . . . *from the time of filing a notice of such lien as prescribed in this chapter*." N.Y. LIEN LAW § 3 (emphasis added). Section 2(4) of the New York Lien Law was amended in 1982 to enable real-estate brokers to file mechanics liens. *See Robert Plan Corp. v. Greiner-Maltz Co., Inc.*, 229 A.D.2d 122, 122 (N.Y. App. Div. 1997). But the Ad Hoc Committee failed to satisfy the statutory elements required to establish the brokers' liens. First, section 3 provides that the lien shall be on real property. Real property is defined under New York Lien Law, in pertinent part, as "real estate, lands, tenements and hereditaments, corporeal and incorporeal, [and] fixtures." N.Y. LIEN LAW § 2(2). This definition does not include cash. Further, the Ad Hoc Committee offered no evidence to suggest that any notice of such lien was filed in accordance with New York Lien Law. Last, the court in *Greiner-Maltz* held that the provision allowing real estate brokers to file mechanics liens is restricted to "brokerage contracts between a property owner/lessor and a broker." 229 A.D.2d at 123. The Debtors are the actual brokers holding contracts with property owners; the objectors are agents (either employees or independent

17

contractors) of the Debtors; the agents are not parties to the contracts with the property owners. (Rispoli Decl. ¶¶ 21-23.) Consequently, the Ad Hoc Committee failed to establish the existence of any such liens.

Additionally, real estate brokers may secure their commissions through section 294-b of New York Real Property Law. *See Homespring, LLC v. Hyung Young Lee*, 55 A.D.3d 541, 542 (N.Y. App. Div. 2008). Under section 294-b, a broker may record a broker's affidavit of entitlement to commission for completed brokerage services. *See* N.Y. REAL PROP. LAW § 294-b. When properly recorded, however, such an affidavit is not a lien. *Id.* § 294-b(3) (requiring county clerk to record the affidavit and "note thereon that such notice does not constitute a lien"). Here, there was no evidence offered that any brokers attempted to record such an affidavit prior to the Petition Date and, even if they had done so, it would not grant them a lien on any property or commissions. Consequently, the Ad Hoc Committee did not establish that any of the brokers it represents hold a lien on unpaid commissions.

### D. The Ad Hoc Committee Has Failed to Establish the Existence of a Trust Pursuant to New York Lien Law

Although the Ad Hoc Committee only argued that their clients have a lien on unpaid commissions, counsel to the Ad Hoc Committee provided the Court with section 70 of Article 3-A of New York Lien Law. This section of New York Lien Law relates to the circumstances under which a trust is created for the benefit of certain contractors, subcontractors, and laborers. This argument was not articulated by the Ad Hoc Committee, and the Ad Hoc Committee was similarly unable to produce evidence sufficient to show that the Debtors are appropriately beneficiaries of a trust under Article 3-A of New York Lien Law.

The existence of a valid mechanic's lien or the right to file such a lien is not a condition precedent to the institution of an action to enforce a trust under Article 3-A. *See* N.Y. LIEN

LAW § 71(4); *see also Ciavarella v. People*, 225 N.Y.S.2d 168, 171 (N.Y. Sup. Ct. 1961).  The

New York Lien Law provides that funds that are received by an owner, a contractor, or a

subcontractor "under or in connection with a contract for an improvement of real property . . .

shall constitute assets of a trust for the purposes provided in section [71] of this chapter."  N.Y.

LIEN LAW § 70(1).[9]  Further, the assets of which a contractor is a trustee must be held and

applied toward certain expenditures arising out the improvement of real property, including

"payment of claims of subcontractors . . . [and] laborers."[10]  *Id.* § 71(2)(a).  In order to establish a

trust under Article 3-A, one must show that a "contractor" received funds in connection with a

contract for "improvement" of real property.  If these elements are satisfied, that contractor, in

turn, is required to hold and apply those funds to pay claims of subcontractors and laborers,

among others.

The Ad Hoc Committee has "the burden of proof on the issue of the validity, priority or

extent of" any interest it asserts on property of the estate.  11 U.S.C. § 363(p).  Here, the Ad Hoc

Committee did not produce any evidence to satisfy the elements required to prove the existence

of a trust under Article 3-A.  The Ad Hoc Committee failed to show that funds were received

"under or in connection with a contract for an improvement of real property."  *Id.* § 70(1).  The

New York Lien Law defines "improvement" as "the performance of real estate brokerage

services in obtaining a *lessee for a term of more than three years* of all or any part of real

property to be used for other than residential purposes pursuant to a written contract of brokerage

---

[9]    New York Lien Law defines "contractor" as "a person who enters into a contract with the owner of real property for the improvement thereof."  N.Y. LIEN LAW § 2(9).  Additionally, New York Lien Law defines a "subcontractor," in pertinent part, as "a person who enters into a contract with a contractor and/or with a subcontractor for the improvement of such real property."  *Id.* § 2(10).  Last, New York Lien Law defines "improvement," as including "the performance of real estate brokerage services in obtaining a lessee for a term of more than three years of all or any part of real property to be used for other than residential purposes pursuant to a written contract of brokerage employment or compensation."  *Id.* § 2(4).

[10]    The term laborer "means any person who performs labor or services upon such improvement."  N.Y. LIEN LAW § 2(11).

employment or compensation." *Id.* § 2(4) (emphasis added).  The Ad Hoc Committee did not

present any evidence as to the duration of the contracts, or whether the contracts were between

the Debtors and lessors (*i.e.,* owners) of real property, or between the Debtors and lessees (*i.e.,*

tenants) of real property.  *See Greiner-Maltz Co., Inc.*, 229 A.D.2d at 122.

### E.    The Sale Is Approved Free and Clear Pursuant to Section 363(f)

Section 363(f) of the Bankruptcy Code permits a debtor to sell property, under section

363(b) or (c), free and clear of any interest in such property of an entity other than the estate.  *See*

11 U.S.C. § 363(f).  A sale free and clear of liens may be approved only if at least one of the

following five conditions are met:  (1) applicable non-bankruptcy law permits sale of such

property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the

price at which such property is to be sold is greater than the aggregate value of all liens on such

property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled to accept

a monetary satisfaction of such interest.  *Id.*; *see also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa.

1988) (noting that section 363(f) is written in the disjunctive, authorizing a trustee or debtor-in-

possession to sell property of the estate free and clear of all liens "if any of the five conditions of

§ 363(f) are met").

Here, the Court concludes that sections 363(f)(3) and (f)(5) permit the sale of the Debtors

assets free and clear of any liens or interests.  To the extent any liens or interest exist on the

Debtors' property, based on the evidence adduced at the Sale Hearing, the Court finds that the

purchase price will be "greater than the aggregate value of all liens on such property."  11 U.S.C.

§ 363(f)(3).  Additionally, the objectors that have asserted interests in the Debtors' property

"could be compelled to accept monetary satisfaction of such interest."  11 U.S.C. § 363(f)(5).

The sale of property under section 363(f) is necessarily limited to a "sale[] of *property of the*

20

*estate.*" *In re Signal Hill-Liberia Ave. Ltd. P'ship*, 189 B.R. 648, 653 (Bankr. E.D. Va. 1995) (emphasis added). The objectors failed to show that the Debtors hold any property in trust, or subject to any liens in favor of the agents. Thus, the assets the Debtors' seek to sell constitute property of the Debtors' estates and can be sold free and clear of any liens or interests.

### F.    Modified Waiver of the 14-Day Stay Pursuant to Bankruptcy Rule 6004(h)

Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h). The purpose of this rule is to "provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. A short period of time is often necessary and essential to an objecting party intending to appeal because, if the sale is closed in the absence of a stay, any appeal by an objecting party may well be moot." 10 COLLIER ON BANKRUPTCY ¶ 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011).

The rule permits a court to waive all or part of the fourteen-day stay. Neither the rule nor the Advisory Committee Note addresses the circumstances in which a court should waive the applicable stay. However, Collier notes that because the purpose of the rule is to protect the rights of an objecting party, the court should eliminate the fourteen-day stay period and allow the sale or other transaction to close immediately where there has been no objection to the procedure. *Id.* If an objection has been filed and is overruled, the court should eliminate or reduce the fourteen-day stay period "upon a showing that there is a sufficient business need to close the transaction within the 14-day period and the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected." *Id.* If an objecting party informs the court that it intends to appeal and seek a stay, the fourteen-day stay period "should

21

not be reduced to less than an amount of time sufficient to allow the objecting party to seek a stay, unless the court determines that the need to proceed sooner outweighs the objecting party's interests." *Id.* Here, although the objecting parties have not informed the Court whether they intend to appeal the order granting the Sale Motion, the Court believes that the issues raised in this Opinion warrant a seven-day stay period.

Additionally, pursuant to Bankruptcy Rule 8005, if a party seeks a stay pending appeal, it is normally required to file a bond in a sum sufficient to protect the rights of the party who prevailed in the bankruptcy court. The Bankruptcy Court can, in its discretion "set a bond at or near the full amount of the potential harm to the non-moving parties." *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 351 (S.D.N.Y. 2007). If the objectors appeal the order approving the sale and seek a stay pending appeal, the sale will be delayed and may never close. No other parties submitted bids for Debtors' assets. The record further establishes that without the sale to BGC, the Debtors are likely to face conversion of this case to a case under chapter 7 of the Bankruptcy Code and prompt liquidation of the Debtors' remaining assets. Because of the amount of Debtors' prepetition secured debt and super-priority post-petition debt, it is unlikely that liquidation would result in any recovery for Debtors' unsecured creditors; indeed, Debtors may then be administratively insolvent. Due to this risk, in the event that any parties seek to appeal the Order approving the sale, the parties shall promptly contact the Court, at which time the Court will set the amount of an appeal bond. pursuant to Bankruptcy Rule 8005.

## CONCLUSION

For the reasons discussed above, the Court grants the Sale Motion.  The sale is a valid exercise of the Debtors' business judgment.  A separate order approving the Sale Motion will be entered.  The Settlement Stipulation will also be approved by separate order included in the Stipulation.

Dated: March 27, 2012
        New York, New York

                        _____/s/Martin Glenn_____
                           MARTIN GLENN
                    United States Bankruptcy Judge